1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                         **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   RALPH MARTINEZ,                          Case No. 08-CV-565 BEN (CAB)

12                              Plaintiff,     **ORDER DENYING PLAINTIFF'S**
                                               **MOTION FOR CLASS**
          vs.                                  **CERTIFICATION**
13
                                               [Doc. # 50]
14   EDMUND G. BROWN, JR.,[1] Governor,
     MATTHEW CATE, Secretary of the
15   Department of Corrections and
     Rehabilitation, LELAND MCEWEN,
16   Warden, Calipatria State Prison, ROBERT
     POWELL, Community Partnership Manager,
17   Calipatria State Prison, T. BOREM,
     Correctional Sergeant, Calipatria State
18   Prison, MICHAEL HEIDENREICK, Catholic
     Chaplain, Calipatria State Prison, Officer H.
19   MACIEL, Correctional Officer, Calipatria
     State Prison,
20
                              Defendants.
21

22          Plaintiff Ralph Martinez moves this Court to certify a Federal Rule of Civil Procedure Rule

23   23(b)(2) class comprising all Native American inmates presently or prospectively in the custody of

24   _____

25          [1] The Court changes the caption to reflect the names of the new Governor of the State of
     California and the new Warden of Calipatria State Prison. *See* FED. R. CIV. P. 25(d) ("An action
26   does not abate when a public officer who is a party in an official capacity ... ceases to hold office
     while the action is pending.  The officer's successor is automatically substituted as a party.  Later
27   proceedings should be in the substituted party's name, but any misnomer not affecting the parties'
     substantial rights must be disregarded.  The court may order substitution at any time, but the
28   absence of such an order does not affect the substitution.").

the California Department of Corrections and Rehabilitation ("CDCR").  The stated purpose of Plaintiff Martinez's motion and complaint is to enjoin the CDCR from allegedly violating the rights of the putative class members freely to exercise their Native American Religion under the federal Constitution, the California Constitution, and federal and state statutes.  But, because Mr. Martinez has not carried the burden imposed by Federal Rule of Civil Procedure Rule 23, subparts (a) and (b), respectively, his motion for class certification is **DENIED**.

**I.**

**BACKGROUND**

**A.      Individual Allegations**

Plaintiff Ralph Martinez is a Native American inmate currently incarcerated at Calipatria State Prison ("Calipatria"), a CDCR prison.  (Third Am. Compl. [Doc. # 18] ¶¶ 1–2.)  Plaintiff sues, in their official capacities, Calipatria's warden, its community-partnership manager, its chaplain, and two of its correctional officers, as well as the secretary of the CDCR and the governor of the State of California (collectively, "Defendants").  (*Id.* ¶¶ 9–15.)  Plaintiff alleges that Defendants' policies, procedures, and practices impermissibly burden Plaintiff's right to the free exercise of his religion in violation of: (1) the federal Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*; (2) the First Amendment to the federal Constitution; (3) article I, § 4 of the California Constitution; and (4) California Penal Code § 5009(a) and (5) § 5030.1(a).  (*Id.* ¶¶ 85–218.)

Specifically, Plaintiff avers that Defendants: (1) deny him weekly access to the prison sweat lodge; (2) deny him the right to receive "spiritual gifts" from the outside Native American community; (3) restrict his prison trust-fund purchases to $200 per quarter and/or deny him a trust-fund budget; (4) deny him access to tobacco for religious uses; (5) prohibit him from burning, in his prison cell, herbs (including tobacco) that hold religious significance; (6) deny or restrict his access to a Native American spiritual leader ("NASL"); (7) limit his participation in religious ceremonies; and (8) restrict his right to make items with religious significance ("totems" or "artifacts").  (Third Am. Compl. ¶¶ 85–218.)

///

**B.      Class Claims**

Plaintiff asserts that his religious practices are "universally held by all Native American tribes." (Mot. Class Certification [Doc. # 50] at 2 [citing Expert Report of Len Foster, Doc. # 51-1; Expert Report of James Quisquis, Doc. # 51-2].)  Plaintiff further avers that Defendants have denied, and continue to deny, other Native American inmates – incarcerated at other CDCR institutions – the same federal, state, and statutory rights about which Plaintiff complains.  As such, he proposes a class reaching each and every existing (and future) CDCR institution.

**C.      Definition of Proposed Class**

Plaintiff originally proposed a class under Federal Rule of Civil Procedure 23(b)(2) defined as:

> All Native American prisoners who are practitioners of the Native American Religion, who are now or will be in the custody of the CDCR.

(Mot. Class Certification at 2.)  Following the hearing on the motion for class certification, Plaintiff – at the Court's invitation – amended the proposed class to include two subclasses.  Those subclasses are:

> (1) a "General Population Subclass" comprising Native American prisoners in the general prison population; and

> (2) a "SHU Subclass" comprising Native American prisoners confined to segregated housing units (*i.e.*, security housing units, administrative housing units; protective housing units; and psychiatric housing units).

(Pl.'s Proposed Order Granting Inj. ["Proposed Inj.," attached hereto as "Appendix A"] at 1–2.)

**D.      Plaintiff's Proposed Classwide Injunction**

On behalf of these two subclasses of current and future Native American prisoners who practice the Native American Religion, Plaintiff seeks to require Defendants to provide specified access to objects and ceremonies of religious significance.  Among other acts, Plaintiff's proposed class-wide injunction would mandate that the CDCR do the following:

**1.      As to the General Population Subclass**

a.      set aside an area at each CDCR institution for the purposes of building a sweat lodge; construct that sweat lodge (upon receiving a request from a Native American

- 3 -

1   prisoner); stock the sweat lodge with materials used in the ceremony, including pipe, pipe bag,

2   tobacco, kinnikinnick, bitter root, sage, cedar, sweet grass, copal, angelica root, drum and drum

3   sticks, rattles, prayer stick, flute, medicine bag, abalone shell, tree wood/kindling, mocajete or a

4   stone grinding bowl, eagle feathers, hawk feathers, buffalo or deer skull, antlers, a water dipper,

5   and "traditional native food for the ceremonial feast following the Sweat Lodge Ceremony"; permit

6   inmates to conduct the sweat-lodge ceremony in the absence of a regular NASL; and permit

7   prisoners 6 hours of time to prepare for and conduct the ceremony (Proposed Inj. at 3–4);

8           b.      permit two annual outdoor powwows at the "reasonable advance notice" of

9   a Native American prisoner or "spiritual organization" which

> shall include Native American religious organization
> members, inmate family members, and guests from the
> Native American community, all of whom shall be
> authorized to participate in a ceremonial feast appropriate for
> the ceremony. Unauthorized individuals shall not be granted
> authorization for these ceremonies, but the CDCR prison or
> facility shall not deny authorization of a guest unreasonably
> and such denial must be based on specific measurable
> reasons.

15   (Proposed Inj. at 4); and

16          c.      "allow and provide for culture groups, drum groups, sobriety groups,

17   language groups and medicine way teachings for Native American believers and practitioners, with

18   equal access to these groups as afforded practitioners of other religions in similar groups."

19   (Proposed Inj. at 5.)

20      **2.      As to the SHU Subclass**

21          a.      provide the pipe, through the NASL or a volunteer NASL, once a week to

22   inmates in segregated housing units; and

23          b.      allow SHU members to consult a NASL (or a volunteer NASL) at least once

24   a week.  (Proposed Inj. at 5.)

25      **3.      As to the Entire Putative Class**

26          a.      fund a NASL position "at the same level as other religious positions at

27   CDCR prisons and facilities"; approve volunteer NASLs to serve in the interim period; and pay

28   "all reasonable expenses" of the volunteer NASL (Proposed Inj. at 5–6);

1           b.    permit prisoners to use the pipe during the sweat lodge ceremony, "other

2    authorized observances, and for independent personal prayer at least weekly"; make tobacco or

3    kinnikinnick available for "all uses of the Sacred Pipe, including for independent personal prayer";

4    and make tobacco available to inmates for prayers, offerings, and purification (Proposed Inj. at 6);

5           c.    allow inmates to burn herbs and tobacco daily for personal prayers

6    (Proposed Inj. at 6–7);

7           d.    allow inmates to possess and use following materials to make religious

8    handicrafts: buffalo bones, brass beads, goat lace or sinew, wooden beading looms, nylon thread,

9    small sea shells, glass seed beads ("including red and blue beads"), crow beads, needles, rabbit

10   skin, beaver skin, cowhide, rattlesnake skin, deer skin, porcupine quills, coyote teeth, and wire

11   hooks made of silver and gold (Proposed Inj. at 7);

12          e.    permit prisoners to receive packages from the outside Native American

13   community or to

14           request and obtain religious items and sacred artifacts

15           through existing CDCR policies and procedures, in which case CDCR prison and facilities' shall not refuse a legitimate order, unreasonably delay or confiscate religious items or

16           sacred materials .... If a NASL is absent, a CDCR prison or facility chaplain shall timely process receipt of Native

17           American spiritual packages in accordance with the terms herein.

18   (Proposed Inj. at 7.)

19          f.    establish a religious fund for Native American religious organizations in an

20   amount equal to the funds of other religious prison organizations (Proposed Inj. at 7);

21          g.    allow members to wear medicine bags on the condition that the medicine

22   bag "be constructed in a manner so as to be easily searched, and shall not contain any articles that

23   cannot be easily recognized as authorized articles" but with "a small pinch of tobacco"; allow

24   members to make and possess "tobacco ties" – small fabric rolls of tobacco tied with clove hitches

25   on a string (Proposed Inj. at 8);

26          h.    "allow Native American religious believers and practitioners possession of

27   authorized religious items and sacred articles equal to those possessed by believers and

28   practitioners of the other religions recognized by the CDCR for purposes of transfer between

institutions and prisons under the jurisdiction of the CDCR, and prohibit confiscation of such items" (Proposed Inj. at 8);

        i.    "prohibit defendants from desecrating or unreasonably confiscating Native American religious items and sacred artifacts during cell searches, inspection of spiritual packages, searches of the Sweat Lodge, or searches of Native American religious believers and practitioners moving to or from the Sweat Lodge Ceremony or other religious ceremony.  This includes the search of personal medicine bags at any time. ... The defendants will require any staff that comes into contact with religious items and sacred artifacts to undergo training with regard to proper inspection of these items and to undergo training regarding the Native American religious beliefs and practices employed in the CDCR prisons and institutions" (Proposed Inj. at 8);

        j.    "implement this order in accordance with the reasonable security requirements necessary for safe administration of the prisons and facilities" (Proposed Inj. at 8);

        k.    "promulgate administrative regulations in Title 15 [of the California Code of Regulations] setting forth the terms of this injunction and directing and authorizing wardens and chief administrators at each CDCR prison and facility to develop a detailed set of policies and procedures that will supplement the DOM and establish how each CDCR prison or facility will implement this order.  Included in the administrative regulations will be language to the effect that these policies and procedures may consider each prison and facilities' unique circumstances and particular requirements and operations." (Proposed Inj. at 8.)

**E.**    **The California Department of Corrections and Rehabilitation**

    Plaintiff's operative complaint refers to thirty-three (33) adult prisons operated by the CDCR.  (Third Am. Compl. ¶ 42.)  However, Plaintiff's proposed class definition reaches beyond those conventional prisons to each CDCR institution, camp, or facility in which a Native American inmate is detained or housed.  (*See* Proposed Class Definition, Mot. Class Certification at 2.)  This section therefore reviews the structure of – and the facilities comprising – the CDCR.

    In general, two CDCR divisions deal with the custody – or incarceration – of convicted offenders: (1) the Division of Adult Institutions ("DAI") and (2) the Division of Juvenile Justice. *///*

1     **1.     Division of Adult Institutions**

2         The DAI is responsible for the operation of thirty-three (33) adult institutions, thirty-nine

3     (39) conservation camps, and thirteen (13) community correctional facilities ("CCFs").  *See* CAL.

4     PENAL CODE § 5003; CDCR, CORRECTIONS: MOVING FORWARD (hereinafter, "CDCR,

5     CORRECTIONS") 4 (Fall 2009), *available at* http://www.cdcr.ca.gov/News/2009_Press_Releases/

6     docs/CDCR_Annual_Report.pdf (last visited Mar. 7, 2011).

7         **a.     Traditional Adult Prisons located within California**

8         Inmates are assigned to conventional prisons in California based upon their classification

9     score.  These classification scores, in turn, help to distinguish one traditional prison from another:

10                      A  Level 1 facility has the lowest security and a Level 4
                        facility has the highest security.  Level 4 facilities are
11                      reserved for the most dangerous prisoners, or prisoners who
                        need protection from other inmates.

12    (Defs.' Opp'n to Mot. Class Cert., Expert Report of William J. Sullivan [hereinafter, "Sullivan

13    Report.," Doc. # 80-2] at 2–3.)  The layout, structure, and supervision of a traditional prison turn

14    upon which of the four levels of security is implicated:

15                      Level 1:  These facilities contain open dormitories without a
                        secure perimeter.
16
17                      Level 2:  These facilities contain open dormitories with
                        secure perimeter fences and armed coverage.

18                      Level 3:  These facilities contain individual cells, fenced
                        perimeters and armed coverage.
19
20                      Level 4:  These facilities contain cells, fenced or walled
                        perimeters, electronic security, more staff and armed officers
21                      both inside and outside the installation.

22                      SHU:  Security Housing Unit.  The most secure area within a
                        Level 4 prison designed to provide maximum coverage.
23                      These are designed to handle inmates who cannot be housed
                        with the general population of inmates.  This includes
24                      inmates who are validated gang members, gang bosses, shot
                        callers, etc.

25                      RC:  Reception Center.  Provides short term housing to
                        process, classify and evaluate incoming inmates.
26
27                      "Cond.":  Condemned.  Holds inmates with death sentences.

28    (*See* Defs.' Opp'n to Mot. Class Cert., Sullivan Report, at 3.)  Many conventional prisons house a

mixture of minimum-, medium-, and maximum-security inmates.  These mixed-security prisons

include Salinas Valley State Prison, San Quentin State Prison, Centinela State Prison, Ironwood

State Prison, North Kern State Prison, Wasco State Prison, CSP-Corcoran, CSP-Los Angeles

County, Pleasant Valley State Prison, the Richard J. Donovan Correctional Facility, the California

Correctional Institution, CSP-Sacramento, the California Correctional Center, the California

Institution for Women, Folsom State Prison, the California Men's Colony, Central California

Women's Facility, High Desert State Prison, Kern Valley State Prison, Mule Creek State Prison,

and Valley State Prison for Women.[2]

Others incarcerate only a specific level of inmates.  For example, Pelican Bay houses

---

[2] *See* CDCR, Salinas Valley State Prison, "Institution Statistics," http://www.cdcr.ca.gov/ Facilities_Locator/SVSP-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, San Quentin State Prison, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/SQ-Institution_ Stats.html (last visited Mar. 8, 2011); CDCR, Centinela State Prison, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/CEN-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, Ironwood State Prison, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/ ISP-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, North Kern State Prison, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/NKSP-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, Wasco State Prison, "Institution Statistics," http://www.cdcr.ca.gov/ Facilities_Locator/WSP-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, California State Prison, Corcoran, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/ COR-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, California State Prison, Los Angeles County, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/ LAC-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, Pleasant Valley State Prison, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/PVSP-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, Richard J. Donovan Correctional Facility, http://www.cdcr.ca.gov/Facilities_Locator/RJD-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, California Correctional Institution, "Institution Statistics," http://www.cdcr.ca.gov/ Facilities_ Locator/CCI-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, California State Prison, Sacramento, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/SAC-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, California Correctional Center, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/CCC-Institution_ Stats.html (last visited Mar. 7, 2011); CDCR, California Institution for Women, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/CIW-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, Folsom State Prison, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/ FSP-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, California Men's Colony, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/CMC-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, Central California Women's Facility, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/CCWF-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, High Desert State Prison, "Institution Statistics," http://www.cdcr.ca.gov/ Facilities_Locator/HDSP-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, Kern Valley State Prison, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/KVSP-Institution _Stats.html (last visited Mar. 7, 2011); CDCR, Mule Creek State Prison, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/MCSP- Institution_Stats.html (last visited Mar. 7, 2011); CDCR, Valley State Prison for Women, "Institution Statistics," http://www.cdcr.ca.gov/ Facilities_Locator/VSPW-Institution_Stats.html (last visited Mar. 7, 2011).

maximum-security inmates[3]; Avenal State Prison and CSP-Solano[4] house medium-security

inmates; and minimum-security prisoners may be incarcerated at prisons like Chuckawalla Valley

State Prison, the Correctional Training Facility, the Deuel Vocational Institution, or the California

Institution for Men.[5]

### b. Prisons Outside California

To alleviate overcrowding within California, the DAI's Out of State Correctional Facility

Unit transfers inmates to prisons outside California. CAL. CODE REGS. tit. 15, § 3000. These out-

of-state institutions include Florence Correctional Center (Arizona), La Palma Correctional Center

(Arizona), Red Rock Correctional Center (Arizona), Tallahatchie County Correctional Facility

(Mississippi), and North Fork Correctional Facility (Oklahoma).[6]

### c. Rehabilitation, Substance Abuse Treatment, and Medical Facilities

Facilities that specialize in drug addiction and treatment include the California

Rehabilitation Center,[7] as well as the California Substance Abuse Treatment Facility and State

---

[3] See CDCR, Pelican Bay State Prison, http://www.cdcr.ca.gov/Facilities_Locator/ PBSP.html (last visited Mar. 7, 2011).

[4] See CDCR, Avenal State Prison, "Institution Statistics," http://www.cdcr.ca.gov/ Facilities_ Locator/ASP-Institution_Stats.html (last visited Mar. 7, 2011) (Level II); CDCR, California State Prison, Solano, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/ SOL-Institution_Stats.html (last visited Mar. 7, 2011).

[5] See CDCR, Chuckawalla Valley State Prison, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/CVSP-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, Correctional Training Facility, "Institution Statistics," http://www.cdcr.ca.gov/ Facilities_Locator/CTF-Institution _Stats.html (last visited Mar. 7, 2011); CDCR, Deuel Vocational Institution, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/ DVI-Institution_Stats.html (last visited Mar. 7, 2011); CDCR, California Institution for Men, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator /CIM-Institution_Stats.html (last visited Mar. 7, 2011).

[6] See CDCR, California Out of State Correctional Facilities, http://www.cdcr.ca.gov/ Visitors/CA_Out_Of_State_Facilities.html (last visited Mar. 14, 2011).

[7] See CDCR, California Rehabilitation Center, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/CRC-Institution_Stats.html (last visited Mar. 7, 2011).

Prison at Corcoran.[8]  Additionally, the California Medical Facility cares for inmates who are addicted to controlled substances, chronically-ill, suffering from a mental disorder, or developmentally-disabled.  *See* CAL. PENAL CODE § 6102 ("The primary purpose of the medical facility shall be the receiving, segregation, confinement, treatment and care of males under the custody of the Department of Corrections or any agency thereof who are any of the following: (a) Mentally disordered. (b) Developmentally disabled. (c) Addicted to the use of controlled substances. (d) Suffering from any other chronic disease or condition.").  *See also* CDCR, California Medical Facility, http://www.cdcr.ca.gov/Facilities_Locator/CMF.html (last visited March 7, 2011) ("CMF houses a general acute care hospital, correctional treatment center (CTC), licensed elderly care unit, in-patient and out-patient psychiatric facilities, a hospice unit for terminally ill inmates, housing and treatment for inmates identified with AIDS/HIV, general population, and other special inmate housing.  Additionally, the Department of Mental Health operates a licensed, acute care psychiatric hospital within CMF."); CDCR, California Medical Facility, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/CMF-Institution_ Stats.html (last visited March 7, 2011) (noting that CMF cares for Level I, II, and III inmates).

### d.        Restitution, Conservation, and Community Correctional Centers

Aside from treatment facilities and the more conventional prisons, the DAI also oversees restitution centers, conservation centers, and community correctional centers.

### (i)        Restitution Centers

As implied by their name, restitution centers enable prisoners to work to raise funds to pay restitution to crime victims.  CAL. PENAL CODE § 6221; 3 Witkin, CAL. CRIM. LAW, "Punishment" § 10, p. 48 (3d ed. 2000).  Inmates are placed in restitution centers only if they: (a) are employable; (b) "present[] no unacceptable risk to the community;" (c) "do[] not have a criminal history of a conviction for the sale of drugs within the last five years, or for an offense requiring registration pursuant to [CAL. PENAL CODE §] 290, or a serious felony ... or a violent felony;" and (d) "did not

---

[8] *See* CDCR, California Substance Abuse Treatment Facility and State Prison, Corcoran, "Institution Statistics," http://www.cdcr.ca.gov/Facilities_Locator/SATF-Institution_Stats.html (last visited Mar. 7, 2011).

receive a sentence of more than 60 months for the current offense or offenses." CAL. PENAL CODE § 6228. Restitution-center inmates may be supervised either by CDCR personnel or by private contractors. CAL. PENAL CODE § 6225 ("Supervision of inmates in the restitution centers may be by contract with private nonprofit or profit corporations, or by peace officer personnel of the Department of Corrections on a 24-hour basis.").

### (ii)   Conservation Centers

Inmates assigned to conservation centers also work outside the physical boundaries of a conventional prison. Conservation-center inmates may be assigned to work in "forest fire prevention and control, forest and watershed management, recreational area management, fish and game management, soil conservation, and forest watershed revegetation." CAL. PENAL CODE § 1602. The work assigned may be performed at conservation centers or at permanent, temporary, and mobile camps. *Id.* Only physically-fit, minimum-security inmates are eligible to participate in conservation-center work. CDCR, CORRECTIONS at 12–13. "The average sentence for adult inmates selected for camp is less than two years and the average time they will spend in camp is eight months." *Id.* at 12. Eligibility to serve at conservation centers requires that an inmate have no criminal history of violence: Convicted kidnappers, sex offenders, arsonists, and escapees, in particular, are ineligible. *Id.* Currently, the CDCR maintains the Sierra Conservation Center, the North Coast Conservation Center, and the Southern Conservation Center. CAL. PENAL CODE § 6200.

### (iii)   Community Correctional Centers

Finally, community correctional centers house and provide for the supervision and counseling of parolees and prisoners with fixed terms. CAL. PENAL CODE § 6253. While inmates transferred to community correctional centers remain under the legal custody of the CDCR, *id.*, the community centers themselves may be operated by contracted public or private agencies. *Id.* § 6256. Furthermore, prisoners assigned to these community centers may be eligible for furloughs away from the center for employment, education, vocational training or to participate in another employment-and-residence program. *Id.* § 6254.

Related to community correctional centers are the planned "Secure Community Reentry

Facilities." Intended for urban locations, these 500-inmate, as-yet-unbuilt facilities are meant to ease a convicted offender's reintegration into society by placing him or her "in a secure correctional facility within the community prior to parole into that community ...." CAL. PENAL CODE § 6270(b).

**2.      Division of Juvenile Justice**

Comprised of three subdivisions – the Division of Juvenile Facilities, the Division of Juvenile Programs, and the Division of Juvenile Parole Services – the Division of Juvenile Justice operates six (6) facilities as well as two (2) youth fire (or conservation) camps.[9]  In general, juvenile offenders range from 12 to 25 years of age and, on average, they stay approximately 25.5 months in CDCR custody.[10]  Low-risk youth offenders "typically work in state and county parks performing stream clearance, wild land fire prevention tasks, and restoration work."[11]

In sum, in addition to the thirty-three adult CDCR prisons to which Plaintiff alludes in his motion for certification, the Court is faced with a putative class that – by the express terms of its proposed definition – includes Native American inmates currently (or prospectively) incarcerated in: (1) privately-operated prisons outside California; (2) the California Rehabilitation Center; (3) the California Substance Abuse Treatment Facility and State Prison at Corcoran; (4) the California Medical Facility; (5) CDCR restitution centers; (6) CDCR conservation centers; (7) CDCR community correctional centers; (8) the as-yet-unbuilt secure community reentry facilities; (9) the 6 juvenile facilities operated by the DJJ; and (10) the DJJ's 2 youth fire (or conservation) camps.

**II.**

**LEGAL STANDARDS**

To certify a class, the moving party must satisfy four prerequisites enumerated in Federal Rule of Civil Procedure 23(a) and at least one of the requirements of Rule 23(b).  FED. R. CIV. P.

---

[9] CDCR, CORRECTIONS at 28; CDCR, Juvenile Justice, "Summary Fact Sheet" (hereinafter, "Juvenile Justice, 'Summary Fact Sheet'") http://www.cdcr.ca.gov/Juvenile_Justice/ DJJ_Quick_Facts/Summary_Fact_Sheet.html (last visited March 9, 2011).

[10] *Id.*

[11] CDCR, "Youth Conservation Camps," http://www.cdcr.ca.gov/Juvenile_Justice/Facility_ Locations/Youth_Conservation_Camps/index.html (last visited March 8, 2011).

23.

Under Rule 23(a), the party seeking certification must establish: (1) that the class is so large that joinder of all members is impracticable ("numerosity"); (2) that there are one or more questions of law or fact common to the class ("commonality"); (3) that the named parties' claims are typical of the class ("typicality"); and (4) that the class representative will fairly and adequately protect the interests of other members of the class ("adequacy of representation"). FED. R. CIV. P. 23(a). In addition to these explicit requirements, the proposed class definition must also set forth a class that is ascertainable and clearly identifiable. *Simer v. Rios*, 661 F.2d 655, 669 (7th Cir. 1981); *Mazur v. eBay, Inc.*, 257 F.R.D. 563, 567 (N.D. Cal. 2009).

Secondly, the moving party must show that one of Rule 23(b)'s provisions apply. FED. R. CIV. P. 23(b); *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Here, Plaintiff seeks certification pursuant to Rule 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." FED. R. CIV. P. 23(b)(2).

As the party seeking certification, Plaintiff Martinez bears the burden of establishing that he meets the requirements of Rule 23(a) and (b). *Amchem Prods.*, 521 U.S. at 613–14; *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1186 (9th Cir. 2001), *amended by* 273 F.3d 1266 (9th Cir. 2001).

In turn, the Court is obligated to analyze Plaintiff Martinez's Rule 23 evidence rigorously to ensure that he meets his burden. *Gen. Tel. Co. of S. W. v. Falcon*, 457 U.S. 147, 161 (1982) (holding that class actions "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied"); *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 594 (9th Cir. 2010) (holding that, "when considering class certification under Rule 23, district courts are not only at liberty to, but ***must***, perform a rigorous analysis to ensure that the prerequisites of Rule 23 have been satisfied, and this analysis will often, though not always, require looking behind the pleadings to issues overlapping with the merits of the underlying claims") (emphasis added), *cert. granted, in part, on other grounds, by* 79 U.S.L.W. 3339 (Dec. 6, 2010).

Although class certification is not the appropriate stage to address the merits of the parties' claims and defenses, the "rigorous analysis" required necessarily involves consideration of what the parties must prove. *Amchem Prods.*, 521 at 622–23 & n.18; *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 & n.12 (1978). If the elements of the claims Plaintiff must prove include individualized inquiries that cannot be addressed in a manner consistent with Rule 23, then the class cannot be certified. *Hohider v. United Parcel Serv., Inc.*, 574 F.3d 169, 184 (3rd Cir. 2009).

**III.**

**DISCUSSION**

**A.     Plaintiff Fails to Satisfy the Rule 23(a) Requirements of Typicality and Adequacy of Representation**

The Court finds that Plaintiff satisfies the Federal Rule of Civil Procedure 23(a) requirements of numerosity and commonality, but ***not*** typicality or adequacy of representation.

**1.     Numerosity**

Pursuant to Rule 23, the putative class must be "so numerous that joinder of all members is impracticable." FED. R. CIV. P. 23(a)(1). As a general rule, classes greater than 41 individuals satisfy the numerosity requirement. *See* 5 James Wm. Moore, MOORE'S FEDERAL PRACTICE § 23.22[1][b] (3d ed. 2004). Although Plaintiff need not allege an exact number or identity of class members to satisfy the numerosity prerequisite, he must provide a reasonable estimate of the number. *Id.* § 23.22[3].

Here, Plaintiff posits that the putative class will include over 100 inmates who "are sincere practitioners of Native American religious beliefs"[12]: 126 inmates submitted declarations in support of Plaintiff's certification motion. (Mot. Class Certification, Mem. P. & A., 6.) Plaintiff further urges that the transience of the Native American inmate population and the "rotating membership of the proposed class," which includes future inmates, makes joinder even more impracticable. (*Id.* at 6–7.)

---

[12] *See, e.g., Shakur v. Schriro,* 514 F.3d 878 (9th Cir. 2008) (holding that a belief must be "sincerely held" and "rooted in religious belief" to implicate the "free exercise" clause of the First Amendment to the federal Constitution) (citing *Malik v. Brown,* 16 F.3d 330, 333 (9th Cir. 1994)).

1    Insofar as Plaintiff shows that his putative class would include at least 126 Native

2    American inmates in CDCR custody, the Court finds that Plaintiff has satisfied the requirement of

3    numerosity.

4         **2.    Commonality**

5         Federal Rule of Civil Procedure 23(a)(2) requires common "questions of law or fact"

6    among putative class members. FED. R. CIV. P. 23(a)(2).  The commonality requirement "serves

7    chiefly two purposes: (1) ensuring that absentee members are fairly and adequately represented;

8    and (2) ensuring practical and efficient case management." *Rodriguez v. Hayes*, 591 F.3d 1105,

9    1122 (9th Cir. 2010) (quoting *Walters v. Reno*, 145 F.3d 1032, 1045 (9th Cir. 1998)).  The Ninth

10   Circuit Court of Appeals construes this requirement "permissively": not all questions of fact and

11   law must be common. *Rodriguez*, 591 F.3d at 1122.  Indeed, a single significant issue common to

12   the class suffices to meet the commonality requirement.  *Dukes,* 603 F.3d at 599.

13        Here, Plaintiff broadly frames the proposed class' claim for relief as constitutional in nature

14   – *i.e.*, the alleged infringement of the putative class member's right freely to exercise his/her

15   religion, as safeguarded under the federal and state constitutions, as well as by federal and state

16   statutes.  All 126 declarations submitted by Plaintiff relate to this issue.  Consequently, the Court

17   finds that Plaintiff meets the commonality requirement under the law of this Circuit.

18        **3.    Typicality**

19        As it does with commonality, the Ninth Circuit construes the typicality requirement[13]

20   "permissively" and requires only that the representative's claims be "reasonably co-extensive with

21   those of absent class members." *Rodriguez*, 591 F.3d at 1124.  The claims of the putative class

22   representative need not be substantially identical to those of putative members.  *Id.*  Even so, the

23   Court cannot find that Plaintiff Martinez's claims are typical of those of Native American inmates

24   across all CDCR institutions.

25        To be sure, Plaintiff submitted 126 declarations from fellow inmates in support of his

26

27        [13] *See* FED. R. CIV. P. 23(a)(3) ("One or more members of a class may sue or be sued as
28   representative parties on behalf of all members only if: the claims or defenses of the representative
     parties are typical of the claims or defenses of the class").

motion for class certification.[14]  But these declarations come from only 17 traditional adult prisons – Pleasant Valley (26 declarations); Calipatria State Prison (25 declarations); California Men's Colony (15 declarations); Corcoran State Prison (13 declarations); Mule Creek State Prison (8 declarations); Central California Women's Facility (7 declarations); Donovan Correction Facility (5 declarations); Oklahoma North Fork Prison (5 declarations); Correctional Training Facility (4 declarations); CSP-Lancaster (4 declarations);  CSP-Sacramento (3 declarations); Kern Valley

---

[14] *See* Mot. Class Certification, Decl. of Edward Feistel [Doc. # 53], Paul Carrillo [Doc. # 54], Everett Basquez [Doc. # 55], Michael Cuero [Doc. # 56], Michael Coe [Doc. # 57], Billy Jones [Doc. # 58], Harold Rhodes [Doc. # 59], Darren Robinson [Doc. # 60], James Torres [Doc. # 61], Gabriel Gomez [Doc. # 62], Richard Matthews [Doc. # 63], Alex Holguin [Doc. # 64], Bruce Bonney [Doc. # 65], Nicholas Novelo [Doc. # 66], Ruben Lopez [Doc. # 67], Josie Corella [Doc. # 68], Gregory Rhoades [Doc. # 69-1], Manuel Moreno [Doc. # 69-2], Shawn Chambers [Doc. # 69-3], Sherman Brown [Doc. # 69-4], Michael Claude [Doc. # 70-1], Bruce Allen [Doc. # 70-2], Joe Hernandez [Doc. # 70-3], Arturo Cordero [Doc. # 70-4], Benny Lewis, Jr. [Doc. # 70-5], Christopher Brownen [Doc. # 70-6], Danny Davis [Doc. # 71-1], David Weeding [Doc. # 71-2], Jesse Salinas [Doc. # 71-3], Joey Barrientos [Doc. # 71-4], Jorge Luis Pitto [Doc. # 71-5], Michael Smith [Doc. # 71-6], Michael Wauneka [Doc. # 71-7], Richard Perez [Doc. # 71-8], Richard Sandoval [Doc. # 71-9], Sergio Moran [Doc. # 71-10], Shawn McFee [Doc. # 71-11], Willie Holguin [Doc. # 71-12], Diana Covarrubias [Doc. # 72-1], Gina Apodaca [Doc. # 72-2], Amelia Ibarra [Doc. # 72-3], Dorothea Hammon [Doc. # 72-4], Pearl Licano [Doc. # 72-5], Zina Pacheco [Doc. # 72-6], Alan Abraham [Doc. # 73-1], Bill Khan [Doc. # 73-2], George Chesko [Doc. #  73-3], Gregory Coates [Doc. # 73-4], James O'Rourke [Doc. # 73-5], Jody Noel [Doc. # 73-6], John Simpson [Doc. # 73-7], Louis Snyder [Doc. # 73-8], Nathan Lopez [Doc. # 73-9], Pedo Cota [Doc. # 73-10], Raymond Fimbres [Doc. # 73-11], Richard Byard [Doc. # 73-12], Wayne Anderson [Doc. # 73-13], William Mayhugh [Doc. # 73-14], Harold Brown [Doc. # 74-1], Buddy Velarde [Doc. # 74-2], Gonzalo Alvarado [Doc. # 74-3], Gray Wolf Enriquez [Doc. # 74-4], Robert Morales [Doc. # 74-5], Steve Cruz [Doc. # 74-6], Armando Mendoza [Doc. # 74-7], Eddie Shane [Doc. # 74-8], Zachariah Guzman [Doc. # 74-9], Steven Espinoza [Doc. # 75-1], Vaughn Bill Shade [Doc. # 75-2], Travis Weber [Doc. # 75-3], Michael Yslas [Doc. # 75-4], Samuel Escobar [Doc. # 75-5], Jason P. Toggery [Doc. # 75-6], Thomas Pease [Doc. # 75-7], Wayne Bengochia [Doc. # 75-8], Arthur Grow [Doc. # 75-9], Ovral Flannery [Doc. # 75-10], Richard Scott Luna [Doc. # 75-11], David Deleon [Doc. # 76-1], Joshua Shebby [Doc. # 76-2], Mario Lara [Doc. # 76-3], Victor Montelongo [Doc. # 76-4], Charles Russ [Doc. # 76-5], Sheldon Melton [Doc. # 76-6], Charles A. Green [Doc. # 76-7], Jimmy Ward [Doc. # 76-8], J. R. Eagle Solis [Doc. # 76-9], Paul Martinez [Doc. # 76-10], George R. Bacca [Doc. # 76-11], Steven Johnson [Doc. # 76-12], Carl Bonner [Doc. # 77-1], David F. Hill [Doc. # 77-2], Dominick D. Chapparosa [Doc. # 77-3], Eddie Flores [Doc. # 77-4], Vincent Valdez [Doc. # 77-5], Jason Coryell [Doc. # 77-6], Anthony Behill [Doc. # 77-7], Frank Garcia [Doc. # 77-8], Ira Boniface [Doc. # 77-9], Jesse Mosquda [Doc. # 77-10], John Montano [Doc. # 77-11], Jose Galaz [Doc. # 77-12], Montantes Monterubio [Doc. # 77-13], Nathan French [Doc. # 77-14], Patrick Carrizosa [Doc. # 77-15], Richard Nelson [Doc. # 77-16], Ronald Gabriel [Doc. # 77-17], Stan Galaz [Doc. # 77-18], Vince Ortiz [Doc. # 77-19], Rocky Lapham [Doc. # 78-1], Alberto Saa [Doc. # 78-2], Andrew Machado [Doc. # 78-3], Barry Bausman [Doc. # 78-4], Brian Eversole [Doc. # 78-5], Frank Wells [Doc. # 78-6], Gary W. Harold [Doc. # 78-7], Jeremiah Helms [Doc. # 78-8], Keith R. Wilson [Doc. # 78-9], Robert Vasquez [Doc. # 78-10], Steve Mason [Doc. # 78-11], Walter Simmons [Doc. # 78-12], Larry Dean Padilla [Doc. # 79-1], Mark C. Mancebo [Doc. # 79-2], Brad Thompson [Doc. # 79-3], James McCray [Doc. # 79-4], and Ram R. Gonzales [Doc. # 79-5].

State Prison (3 declarations); Salinas Valley State Prison (3 declarations); Folsom State Prison (2 declarations); Ironwood (1 declaration); Tallahatchie County Correctional Facility (1 declaration); and Wasco State Prison (1 declaration).

But, whatever conclusions one might extrapolate from a single declaration to the treatment of all Native American Religion practitioners at an institution such as Ironwood, Wasco, or Mississippi's Tallahatchie, the Court does ***not*** have the benefit of even a single declaration from Pelican Bay, San Quentin, Centinela, North Kern, CSP-Los Angeles County, the California Correctional Institution, the California Correctional Center, the California Institution for Women, High Desert, Valley State, or Arizona's Florence, La Palma, and Red Rock Correctional Centers. Nor does Plaintiff offer evidence from those CDCR institutions where inmates require specialized care (*e.g.*, the Medical Facility) or where inmates warrant nontraditional incarceration or rehabilitation (*e.g.,* fire-line conservation camps and juvenile facilities).  In the absence of supporting evidence, the Court cannot assume that Plaintiff's claims are typical of those of inmates in a different conventional prison, much less those of inmates in nontraditional institutions.

On a related note, the Court finds that unique defenses may lay against Plaintiff where they might not lay against an inmate with a different prison classification, against an inmate living in a different institution, or against an inmate subject to different incarceration conditions.  *See Rodriguez*, 591 F.3d at 1124 (holding that defenses unique to a class representative, in particular, may counsel against class certification only if they "threaten to become the focus of the litigation") (citing *Hanlon v. Dataprods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)).  This is because, as a matter of law, the circumstances of a prisoner's confinement bear directly upon, *inter alia*, the test applied to a prison regulation alleged to impinge upon the right to the free exercise of religion.

When challenging such a regulation, a prisoner must show that the regulation constitutes a substantial burden upon the exercise of his religious beliefs.  If he or she can make that showing, the defendant must then establish that the burden "furthers 'a compelling governmental interest,' ***and*** does so by 'the least restrictive means.'"  *Warsoldier v. Woodford,* 418 F.3d 989, 994 (9th Cir. 2005) (emphasis in original) (quoting 42 U.S.C. § 2000cc-1(a)(1)–(2)).  Such a test necessarily takes into account the complainant inmate's particular conditions of incarceration – conditions

which vary widely among the putative class members. Put another way, the CDCR's interest in forbidding a Level 4 inmate like Mr. Martinez[15] the sharp tools necessary to make religious totems may be more compelling than Defendants' interest in forbidding those same tools to a non-violent, Level 1 inmate. Courts must take this into account when adjudicating RLUIPA claims. *See Cutter v. Wilkinson*, 544 U.S. 709, 722–23 (2005) ("We have no cause to believe that RLUIPA would not be applied in an appropriately balanced way, with particular sensitivity to security concerns. While the Act adopts a 'compelling governmental interest' standard, ... '[c]ontext matters' in the application of that standard. Lawmakers supporting RLUIPA were mindful of the urgency of discipline, order, safety, and security in penal institutions. They anticipated that courts would apply the Act's standard with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources.'") (internal citations omitted). And, when "proof of a violation requires individualized inquiry," a common legal theory may not be enough to establish typicality. *Elizabeth M. v. Montenez*, 458 F.3d 779, 787 (8th Cir. 2006).

Plaintiff concedes that the security concerns and conditions of imprisonment necessarily vary from one CDCR facility to another. (*See, e.g.,* Plaintiff's Proposed Inj. at 5, 9 ["BE IT FURTHER ORDERED[] that defendants ... shall, subject to reasonable security regulations, during the pendency of this litigation and as to the Plaintiff Class ... promulgate administration regulations in Title 15 setting forth the terms of this injunction and directing and authorizing wardens and chief administrations at each CDCR prison and facility to develop a detailed set of policies and procedures that will supplement the DOM and establish how each CDCR prison or facility will implement this order***. Included in the administrative regulations will be language to the effect that these policies and procedures may consider each prison and facilities' unique circumstances and particular requirements and operations.***"] [emphasis added].) In structuring his Proposed Injunction to vary according to the varying needs of individual CDCR institutions,

---

[15] *See* Defs.' Opp'n to Mot. Class Cert., Sullivan Rep., at 2 (noting that Plaintiff's prison "is a Level IV... prison").

1   Plaintiff impliedly acknowledges that putative class members are ***not*** similarly situated and may

2   not be treated, ultimately, as if they were.  Accordingly, the Court finds that Plaintiff's evidence is

3   insufficient to establish that his claims are typical of all putative class members.

4         **4.      Adequacy of Representation**

5         The same concerns that bar a finding of typicality inform the Court's Rule 23(a)(4)

6   "adequacy of representation" analysis.  To satisfy constitutional due process concerns, unnamed

7   class members must be afforded adequate representation before entry of a judgment that binds

8   them.  *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1020 (9th Cir. 1998) (citing *Hansberry v. Lee*,

9   311 U.S. 32, 42–43 (1940)); Fed. R. Civ. P. 23(a)(4) ("the representative parties will fairly and

10  adequately protect the interests of the class").  "Adequate representation," in turn, depends upon

11  "the qualifications of counsel for the representatives, an absence of antagonism, a sharing of

12  interests between representatives and absentees, and the unlikelihood that the suit is collusive."

13  *Crawford v. Honiq,* 37 F.3d 485, 487 (9th Cir. 1994) (quoting *Brown v. Ticor Title Ins. Co.,* 982

14  F.2d 386, 390 (9th Cir. 1992)).  In short, legal adequacy depends upon:  (a) whether the named

15  plaintiff and his counsel have any conflicts of interests with other class members and (b) whether

16  the named plaintiff and his counsel will prosecute the action vigorously on behalf of the class.

17  *Hanlon*, 150 F.3d at 1020.

18        Although Defendants do not dispute the legal adequacy of Plaintiff or his counsel (*see*

19  *generally* Opp'n to Mot. Class Certification [Doc. # 80]), for the reasons discussed above, the

20  Court is not satisfied that Plaintiff's interests are sufficiently aligned with those of other CDCR

21  Native American Religion practitioner inmates to render Mr. Martinez an adequate representative

22  as a matter of law.  Plaintiff's demands – specific as they are to the restrictions allegedly found at

23  Calipatria State Prison – may be different from the demands of a condemned inmate or a

24  community correctional center inmate.  And Plaintiff's evidence, limited as it is to certain inmates

25  in certain conventional prisons, does not lay a sufficient evidentiary foundation to support an

26  adequacy determination as to either conventional-prison inmates or inmates incarcerated in less

27  conventional CDCR facilities.

28  //

**B.      Plaintiff Fails to Satisfy the Rule 23(b)(2) Requirements**

Plaintiff seeks to certify the putative class under Rule 23(b)(2).  By its terms, a Rule 23(b)(2) class is appropriate only where the defendants have acted consistently toward the putative class *and* where the putative class is amenable to uniform group remedies.  FED. R. CIV. P. 23(b)(2) ("A class action may be maintained if Rule 23(a) is satisfied and if ... the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole"); *see also* 2 NEWBERG ON CLASS ACTIONS § 4.11 (4th ed. 2002 & 2010 Suppl.) ("Subdivision (b)(2) sets forth two basic requirements for the maintenance of class actions thereunder.  First, the party opposing the class must have acted or refused to act or failed to perform a legal duty, on grounds generally applicable to all class members .... The second requirement for Rule 23(b)(2) classes is that 'final relief of an injunctive nature or a corresponding declaratory nature, settling the legality of the behavior with respect to the class as a whole, [must be] appropriate.'") (citing FED. R. CIV. P. 23(b)(2) advisory committee's note).

**1.      Plaintiff Fails to Show That Defendants Act Consistently Toward Putative Members**

Although certification opponents need not have acted directly against each member of the class, the opponents must have acted consistently toward them such that the opponents can be said to effect a pattern of activity (or established a regulatory scheme) that is common to all class members.  *See* 2 NEWBERG ON CLASS ACTIONS § 4:11 ("The party opposing the class must have acted or refused to act or failed to perform a legal duty, on grounds generally applicable to all class members. Under this generally applicable language, the defendant's conduct described in the complaint need not be directed or damaging to every member of the class."); 7AA FED. PRAC. & PROC. CIV. § 1775 (3d ed. 2005) ("The courts have interpreted this requirement to mean that the party opposing the class either has acted in a consistent manner toward members of the class so that the opposing party's actions may be viewed as part of a pattern of activity, or has established or acted pursuant to a regulatory scheme common to all class members.  This is consistent with the intention of the Advisory Committee, which stated in its Note to the 1966 amendment of Rule 23

that: 'Action or inaction is directed to a class within the meaning of this subdivision even if it has taken effect or is threatened only as to one or a few members of the class, provided it is based on grounds which have general application to the class.'").

Although Plaintiff claims that the CDCR acts as one to discriminate against Native American inmates with respect to the free exercise of their religion, the inmate declarations fail to establish a consistent pattern of behavior from Defendants, even toward those in conventional prisons.

For example, the California Men's Colony ("CMC") has a spiritual leader, or a NASL, who convenes sweat-lodge ceremonies during which the prison allows inmates to use tobacco.[16]  But Calipatria – which has been without an appointed NASL since before 2006 – relies on an "inmate NASL"[17] to convene sweat-lodge ceremonies with the assistance of chaplains from other denominations, who are authorized to distribute tobacco and sacred herbs for ceremonial use.[18]  In contrast to Calipatria, Wasco State Prison – which does not presently have a NASL –  does not allow inmates to serve in that capacity.[19]  Unique, again, is the Correctional Training Facility ("CTF"), which has a part-time NASL.[20]

With regard to sweat-lodge ceremonies, the CTF convenes these (and permits its inmates to use tobacco during the ceremonies) but has not held a pow-wow in two years.[21]  This distinguishes the CTF from Corcoran State Prison, which permits two pow-wow ceremonies.[22]  Corcoran has held twelve sweat-lodge ceremonies since May 2008, but none in the eight (8) months immediately

---

[16] Decl. of Alan Abraham [Doc. # 73-1] ¶¶ 11, 15.

[17] Decl. of Paul Carrillo [Doc. # 54] ¶¶ 31, 35.

[18] *Id.*

[19] Decl. of Ram Gonzales [Doc. # 79-5] ¶ 16.

[20] Decl. of Steven Espinoza (hereinafter, "Espinoza Decl.") [Doc. # 75-1] ¶ 22.

[21] Espinoza Decl. ¶ 20, 21.

[22] Decl. of Bruce Bonney (hereinafter, "Bonney Decl.") [Doc. # 65] ¶  25, 26.

08cv565

preceding that date.[23] A new sweat-lodge has been built, but several inmates protest that it is too

small, and another states that it does not meet "standard" layout requirements.[24]  And prisoners at

Kern Valley State Prison appear to agree that their prison prohibits sweat-lodge ceremonies

without a NASL,[25] but disagree regarding the availability of that NASL: two inmates state that

Kern Valley does not have a NASL[26] while another attests that a NASL was recently hired.[27]

### 2.    Plaintiff Fails to Show That the Putative Class Is Amenable to Uniform Group Remedies

The requirement that a proposed class be amenable to group remedies implies a requisite

cohesion within the class such that a class-wide injunction would satisfy Federal Rule of Civil

Procedure 65(d)[28] and would not require tailoring to individual class members.  *See Maldonado v.*

*Ochsner Clinic Found.*, 493 F.3d 521, 524 (5th Cir. 2007) (holding that the requirement that the

final injunctive relief sought be appropriate for the class suggests, in turn, a requisite cohesiveness

among class members with respect to their injuries, the absence of which can preclude

certification); *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005); *Barnes v. Am.*

*Tobacco Co.*, 161 F.3d 127, 143 (3rd Cir. 1998); NEWBERG § 4.11.  Put another way, because Rule

23(b)(2) classes seek only injunctions and because any classwide injunction must satisfy Rule

65(d), the Court cannot certify a Rule 23(b)(2) class if it finds that: (1) a putative class' proposed

injunction is too general to pass Rule 65(d) muster or (2) the allegedly wrongful conduct of the

defendant cannot be corrected without specific tailoring of the injunction to individual members.

These are the Court's very concerns with the proposed class-wide injunction, here.  As

---

[23] Decl. of Buddy Velarde [Doc. # 74-2] ¶  14, 16.

[24] Bonney Decl. ¶  22.

[25] Decl. of Victor Montelongo (hereinafter, "Montelongo Decl.") [Doc. # 76-4] ¶ 16.

[26] Decl. of Joshua Shebby [Doc. # 76-2] ¶ 9; Decl. of Mario Lara [Doc. # 76-3] ¶ 9.

[27] Montelongo Decl. ¶¶ 20, 22.

[28] Federal Rule of Civil Procedure 65(d)(1) provides:  "Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail–and not by referring to the complaint or other document–the act or acts restrained or required."

noted above, Plaintiff's Proposed Injunction – which facially covers each and every CDCR facility – incorporates terms that must be defined according to the specific circumstances of the complainant and his or her prison.[29]  Examples of such ambiguous terms include the express language subjecting Defendant's compliance "to **reasonable considerations**, during the pendency of this litigation and as to the General Population Subclass."  (Proposed Inj. at 3:23–25 [emphasis added]; *see also id.* at 9:4–5 [Defendants are to "implement this order in accordance with the **reasonable security** requirements **necessary** for **safe administration** of the prisons and facilities"] [emphasis added]; *id.* at 9:9–12 ["Included in the administrative regulations will be language to the effect that **these policies and procedures may consider each prison and facilities' unique circumstances and particular requirements and operations**."] [emphasis added]).

Other language requiring the Court specifically to tailor include:

- "Native American religious believers and practitioners shall be given **routine and regular access** to a Sweat Lodge for religious use, **subject to reasonable security restrictions in effect at the institution or prison at the time** of the regularly scheduled ceremony."  (Proposed Inj. at 4:14–16 [emphasis added].)

- With regard to the attendance of non-prisoner guests at the requested events, "**[u]nauthorized individuals** shall not be granted authorization for these ceremonies, but the CDCR prison or facility **shall not deny authorization of a guest unreasonably** and such denial must be based on **specific measurable reasons**. CDCR prison and facility standards applied to these ceremonies shall be identical **where applicable and otherwise substantially similar to those standards applied to participants in other group religious observances**."  (Proposed Inj. at 5:1–5 [emphasis added].)

- Defendants are to "allow and provide for **culture** groups, drum groups, sobriety groups, language groups and **medicine way teachings** for Native American religious believers and practitioners ...."  (Proposed Inj. at 5:6–7 [emphasis added].)

- With regard to the entire proposed class, Defendants are to "provide access to the Sacred Pipe for Native American religious believers and practitioners for ... **other authorized observances** ...."  (Proposed Inj. at 6:6–8 [emphasis added].)

- "The CDCR institution or prison shall provide **adequate secure** storage for the Sacred Pipe and pipe bag ...."  (Proposed Inj. at 6:10–11 [emphasis added].)

- Defendants are to "allow Native American religious believers and practitioners

---

[29] Additionally, the Court notes that Plaintiff neither names as defendants each of the individual wardens at each of the CDCR institutions to which the Proposed Injunction would apply, nor seeks to propose a class of defendant CDCR wardens.  *See* Cal. Penal Code § 2087 ("The wardens shall perform such other duties as may be prescribed by the department."); *id.* § 2086 ("The wardens may make temporary rules and regulations, in case of emergency, to remain in force until the department otherwise provides.").

*regular participation* in making handicrafts ...." (Proposed Inj. at 7:3–4 [emphasis added].)

• Defendants are to "allow Native American religious believers and practitioners to request and obtain by purchase or donation, religious items and sacred artifacts used in the Sweat Lodge ceremonies and for making totems .... Some of these items include headbands, wristbands, earrings, rosettes, medicine bags, sweat skirt (breach cloth), headdresses and chokers. Alternatively, Native American religious believers and practitioners may request and obtain *religious items and sacred artifacts* through existing CDCR policies and procedures, in which case CDCR prison and facilities' staff shall not refuse a *legitimate order* .... If an [sic] N[ative] A[merican] S[piritual] L[eader] is absent, a CDCR prison or facility chaplain shall *timely* process receipt of Native American spiritual packages ...." (Proposed Inj. at 7:11–20 [emphasis added].)

• With regard to artifacts such as the medicine bag, the Proposed Injunction states, "The medicine bag shall be constructed *in a manner so as to be easily searched*, and shall not contain any *articles that cannot be easily recognized as authorized articles* ...." (Proposed Inj. at 8:4–6 [emphasis added].)

• Defendants are to be prohibited from "*desecrating or unreasonably confiscating* Native American religious items and sacred artifacts during cell searches, inspection of spiritual packages, searches of the Sweat Lodge, or searches of Native American religious believers and practitioners moving to or from the Sweat Lodge Ceremony or other religious ceremony .... The defendants will require any staff that comes into contact with religious items and sacred artifacts to undergo training with regard to *proper inspection* of these items and to undergo training regarding the Native American religious beliefs and practices employed in the CDCR prisons and institutions." (Proposed Inj. at 8:15–22 [emphasis added].)

• Defendants are to "provide plaintiff with a detailed plan under which the religious needs of the Plaintiff Class will be satisfied according to the terms of this [proposed] injunction. *Upon approval by plaintiff*, this shall be incorporated within the terms of this injunction, after which the defendants shall cause each CDCR prison and facility to review the D[epartment] O[perations] M[anual] Supplement in accordance with the terms of this injunction and the particular requirements and operations of each CDCR prison and facility no later than 6 months from plaintiff's approval of the plan. *Each warden or chief administrator will be given the opportunity during this time to factor unique circumstances and specific administrative considerations for inclusion in the DOM Supplement*." (Proposed Inj. at 8:24–9:3 [emphasis added].)

The Proposed Injunction indisputably attempts to build flexibility into its terms. But this very flexibility violates Federal Rule of Civil Procedure 65(d)'s requirement of specificity. Individual wardens at CDCR facilities would ostensibly be placed under the contempt power of the Court and exposed to sanctions for violating an Injunction whose terms, at worst, are unfixed and, at best, vary according to the institution. The Court would be required to determine, for each facility (or subdivision therein), what constitutes a "reasonable" restriction in light of the needs of an inmate group. Where the relief sought by a putative class needs to be tailored to unenumerated

subgroups, a class action is not appropriate. *See* 5 MOORE'S FED. PRAC. § 23.43(2)(b) ("A class action may not be certified under Rule 23(b)(2) if relief specifically tailored to each class member would be necessary to correct the allegedly wrongful conduct of the defendant.").

The Court finds that certification of a Rule 23(b)(2) class is inappropriate, here.

## C.   PLAINTIFF BEARS THE BURDEN OF REFINING PROPOSED CLASSES

During the hearing on this motion, the Court invited Plaintiff to refine the proposed class definition to address some of the concerns set forth above.  Plaintiffs subdivided the class from one into a mere two – general-population inmates and secured-housing-unit inmates.  But, as the Court has noted, these two broad categories fail to account for putative class members: (1) who are differently classified within the same conventional prison; and (2) who do not live in a conventional adult prison setting, in the first instance.  To the extent that more precise class definitions are required for certification, the burden of composing those definitions fell to Plaintiff, and Plaintiff failed to carry his burden.  *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980) ("[I]t is not the District Court that is to bear the burden of constructing subclasses. That burden is upon the [movant] and it is he who is required to submit proposals to the court.").

## IV.

## CONCLUSION

For all of the foregoing reasons, Plaintiff Martinez's motion for class certification is **DENIED**.

**IT IS SO ORDERED.**

**DATED:  March 24, 2011**

_____

**Hon. Roger T. Benitez**
**United States District Judge**

08cv565

1

2

3

4

5

6

7

8            **UNITED STATES DISTRICT COURT**

9            **SOUTHERN DISTRICT OF CALIFORNIA**

10

11   RALPH MARTINEZ,                              Case No. 08-CV-565 BEN (CAB)

12                                                **APPENDIX A**

13                              Plaintiff,        **TO THE ORDER DENYING**
                                                  **PLAINTIFF'S MOTION FOR CLASS**
          vs.                                     **CERTIFICATION**
14

15   ARNOLD SCHWARZENEGGER,
     Governor, MATTHEW CATE, Secretary of
16   the Department of Corrections and
     Rehabilitation, LARRY SMALL, Warden,
17   Calipatria State Prison, ROBERT POWELL,
     Community Partnership Manager, Calipatria
18   State Prison, T. BOREM, Correctional
     Sergeant, Calipatria State Prison, MICHAEL
19   HEIDENREICK, Catholic Chaplain,
     Calipatria State Prison, Officer H. MACIEL,
20   Correctional Officer, Calipatria State Prison,

21                              Defendants.

22

23

24

25

26

27

28

David Dehnert, SBN 214243
Attorney at Law
838 Venezia Ave.
Venice, California 90291
Telephone:  310/822-3222
Facsimile:  310/577-5277
Email:  ddehnert@ca.rr.com

Lestor J. Marston, SBN 081030
Rapport and Marston
P.O. BOX 488
405 West Perkins Street
Ukiah, CA 95482
Telephone: 707/462-6846
Facsimile: 707/462-4235
Email:  marston1@pacbell.net

Attorneys for Plaintiff
Ralph Martinez

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH MARTINEZ,<br><br>               Plaintiff,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER,<br>et al.,<br><br>               Defendants. | CASE NO. 3:08-cv-00565-BEN-CAB<br><br>(PROPOSED) ORDER GRANTING INJUNCTION |

The motion of Plaintiff Ralph Martinez, on his own behalf and on behalf of all others similarly situated for a preliminary injunction came on for noticed hearing before the Honorable Roger T. Benitez, United States District Judge, at __ a.m., on _____. After considering the pleadings, memoranda, declarations and arguments of counsel regarding said motion, the court finds as follows:

    1.  The court certified this matter as a class action under Federal Rules of Civil Procedure 23(b)(2) with two subclasses of Native American religious believers and practitioners: those

1    confined to the general prison population and those confined to segregated housing units (security

2    housing units; administrative housing units; protective housing units; and psychiatric housing units)

3    in California Department of Corrections and Rehabilitation (CDCR) prisons and facilities.[1]

4    Hereinafter, the CDCR general prison population subclass is referred to as "General Population

5    Subclass," the segregated housing unit subclass is referred to as the "SHU Subclass," and both

6    subclasses are collectively referred to as the "Plaintiff Class." Each of these classes of inmates

7    includes all out-of-State facilities under contract with the CDCR to incarcerate California inmates.

8         2.   Members of the Plaintiff Class, incarcerated in CDCR prisons and facilities, have

9    attempted since before January 2006, through the appropriate procedures established by the CDCR,

10   to secure regular access to a Native American Spiritual Leader (NASL), weekly access to Sweat

11   Lodge and Sacred Pipe ceremonies, participation in making Native American totems, participation

12   in at least two powwows annually in conjunction with the solstices and/or equinoxes that includes a

13   ceremonial feast and participation by the outside Native American community and inmate family

14   members, and to obtain and use religious items and sacred artifacts, including herbs and tobacco,

15   necessary for practicing their Native American religious beliefs.

16        3.   Defendant Arnold Schwarzenegger, acting individually and as Governor of California,

17   defendant Matthew Cate, acting individually and as Director of the CDCR, defendant Larry Small,

18   acting individually and as Warden of Calipatria State Prison, defendant Robert Powell, acting

19   individually and as Community Partnership Manager at Calipatria State Prison, defendant T. Borem,

20   acting individually and as Correctional Sergeant at Calipatria State Prison, defendant Michael

21   Heidenreick, acting individually and as Catholic Chaplain at Calipatria State Prison, and defendant

22   H. Maciel, acting individually and as an officer at Calipatria State Prison and at all times relevant to

23   this action, either were aware or should have been aware of the attempts of the members of Plaintiff

24   Class to secure regular access to a NASL, weekly access to Sweat Lodge and Sacred Pipe

25   ceremonies, participation in making Native American totems, participation in at least two powwows

26   annually in conjunction with the solstices and/or equinoxes that includes a ceremonial feast and

27

28        _____

         [1] These subclasses are applicable to out-of-State transferred inmates.

participation by the outside Native American community and inmate family members, and to obtain and use religious items and sacred artifacts, including herbs and tobacco, necessary for practicing their Native American religious beliefs.

4.  Defendants Schwarzenegger, Cate, Small, Powell, Borem, Heidenreick, and Maciel, acting individually and in their official capacities, at all times relevant to this action, are required to provide or make available to CDCR inmates who are Native American religious believers and practitioners the facilities, materials and religious items necessary for the practice of the Native American religion, in compliance with Cal. Code Regs. Title 15 ("Title 15"), §§ 3210-3213, and 3270 the CDCR Department of Corrections Operations Manuel (DOM), Article 3, § 101030.1; Article 6, §§ 101060.1-101060.14; Article 43, §§ 54030.7, 54030.10.9 and 54030.12.2; Article 51, § 54080.13and the DOM supplements for Native American religious services for each CDCR prison and facility.

5.  Defendants Schwarzenegger, Cate, Small, Powell, Borem, Heidenreick, and Maciel, acting as individuals and in their official capacity, have denied members of the Plaintiff Class access to a NASL, Sweat Lodge and Sacred Pipe Ceremony, and  participation in totem-making, attending 2 powwows annually with a ceremonial feast and participation by the outside Native American community and inmate family members, and obtaining and using religious items and sacred artifacts, including herbs and tobacco, necessary for practicing their religion.

6.  The members of the Plaintiff Class, acting by and through their attorneys, have established to the satisfaction of the court that they have and will continue to suffer irreparable injury because of their inability to practice their religion, and that there is a substantial likelihood that they will prevail on the merits in this action.

**WHEREFORE, it is hereby ORDERED**, that defendants Schwarzenegger, Cate, Small, Powell, Borem, Heidenreick, and Maciel shall, subject to reasonable security considerations, during the pendency of this litigation and as to the General Population Subclass:

1.  provide an area within CDCR prison or facility grounds to construct a Sweat Lodge at each institution or prison where a request for a Sweat Lodge is made by Native American religious believers and practitioners and where sufficient numbers of such individuals are incarcerated as to

justify the construction and regular use of a Sweat Lodge. Numerical sufficiency shall be determined in accord with the standards applied to other religions recognized by the CDCR. The administration of the institution or prison shall cooperate with Native American prisoners and interested outside community volunteers or groups who have been appropriately cleared and approved by the individual institution or prison administration, to provide the materials necessary for the construction, operation and use of a Sweat Lodge, including a sufficient amount of firewood and water to conduct sweat ceremonies on a weekly basis at agreed-upon periods of time, periodic replacement of willow branches, tarps/blankets, hoses, and river or lava rocks as needed, and the following sacred materials used in the Sweat Lodge Ceremony: Sacred Pipe, pipe bag, tobacco, kinnikinnick, bitter root, sage, cedar, sweet grass, copal, angelica root, drum and drum sticks, rattles, prayer stick, flute, personal medicine bag, abalone shell, tree wood/kindling, mocajete (stone grinding bowl), eagle feather(s), hawk feather(s), buffalo or deer skull(s), antler(s), water dipper (metal or shell), and traditional native food for the ceremonial feast following the Sweat Lodge Ceremony. Native American religious believers and practitioners shall be given routine and regular access to a Sweat Lodge for religious use, subject to reasonable security restrictions in effect at the institution or prison at the time of the regularly scheduled ceremony. Sweat ceremonies shall be scheduled for at least 2 hours, excluding preparation time of 2 hours. Inmate ministers may conduct the Sweat Lodge Ceremony in the absence of the NASL or volunteer NASL, and the warden or administrative officer shall not unreasonably withhold approval of this responsibility. Sweat Lodge ceremonies will continue during modified programs equal to other religious group ceremonies.

2.   allow and provide for ceremonies on special occasions, which shall include at least 2 outdoor powwows annually during the solstices or equinoxes and mourning ceremonies, and based upon the reasonable advance notice of the Native American spiritual organization or inmate. The warden or designee shall not refuse these ceremonies unreasonably or because a NASL is not active at the prison or institution, and the warden or designee shall grant requests made by recognized Native American religious organizations without the approval of a chaplain. Participants at these ceremonies shall include Native American religious organization members, inmate family members, and guests from the Native American community, all of whom shall be authorized to participate in a

ceremonial feast appropriate for the ceremony. Unauthorized individuals shall not be granted authorization for these ceremonies, but the CDCR prison or facility shall not deny authorization of a guest unreasonably and such denial must be based on specific measurable reasons. CDCR prison and facility standards applied to these ceremonies shall be identical where applicable and otherwise substantially similar to those standards applied to participants in other group religious observances.

3.  allow and provide for culture groups, drum groups, sobriety groups, language groups and medicine way teachings for Native American religious believers and practitioners, with equal access to these groups as afforded practitioners of other religions in similar groups.

**BE IT FURTHER ORDERED**, that defendants Schwarzenegger, Cate, Small, Powell, Borem, Heidenreick, and Maciel shall, subject to reasonable security considerations, during the pendency of this litigation and as to the SHU Population Subclass:

1.  make available the Sacred Pipe for personal prayer on at least a weekly basis to inmates residing in segregated housing units, which shall be conducted by the NASL or volunteer NASL according to the NASL's regular pastoral duties.

2.  authorize regular visits, which shall be no less than weekly, by the NASL or volunteer NASL to individual Native American religious believers and practitioners for Sacred Pipe ceremonies, prayers, religious songs, and communion.

**BE IT FURTHER ORDERED**, that defendants Schwarzenegger, Cate, Small, Powell, Borem, Heidenreick, and Maciel shall, subject to reasonable security considerations, during the pendency of this litigation and as to the Plaintiff Class:

1.  guarantee all Native American religious believers and practitioners incarcerated within CDCR prisons and facilities reasonable access to and contact with a NASL as necessary for performing the same duties as other CDCR chaplains, which will include leading Sweat Lodge ceremonies, Sacred Pipe ceremonies, obtaining, using and possession of tobacco, ordering and obtaining religious and spiritual items for religious ceremonies and practices, completing all administrative requirements for at least 2 powwows per year that include traditional food, songs, dance and participation of outside family and community members. To this end, the defendants shall fund a NASL position at the same level as other religious positions at CDCR prisons and

(Proposed) Order Granting Injunction

-5-

Martinez v. Schwarzenegger, et al.
Case No. 3:08-cv-00565-BEN-CAB

facilities. The determination allocating the percentage number of work hours the NASL shall spend at each institution shall be made in accord with the method used to determine the same allocations for other chaplaincy positions within the CDCR. Until this position is filled, the defendants shall approve qualified volunteer NASLs to perform these duties, and the defendants shall pay all reasonable expenses for the performance of these duties, including travel.

2.  provide access to the Sacred Pipe for Native American religious believers and practitioners for offerings and prayers during the Sweat Lodge Ceremony, for other authorized observances, and for independent personal prayer at least weekly. The NASL, other recognized spiritual leader, or a qualified inmate minister, shall have access to the Sacred Pipe and pipe bag in which it is carried. The CDCR institution or prison shall provide adequate secure storage for the Sacred Pipe and pipe bag when not in use if it is not carried off premises by the NASL or other spiritual leader. The Pipe Ceremony begins by the Pipe Holder and other participants purifying themselves and the pipe by burning sage or sweet grass. The Pipe Holder then fills the pipe with tobacco, praying to various spirits. The other participants pray individually. The Pipe Bearer lights the pipe and passes it to the other participants. When the bowl is empty, the Pipe Bearer cleans it and takes apart the pipe, thereby ending the ceremony.

3.  ensure that tobacco or kinnikinnick is available for all uses of the Sacred Pipe, including for independent personal prayer. In the absence of a NASL, who is responsible for bringing tobacco and kinnikinnick into the CDCR prison or facility, the administration of the prison or facility shall cooperate with Native American religious believers and practitioners and interested outside community volunteers or groups who have been appropriately cleared and approved by the individual institution or prison administration, to provide the tobacco and kinnikinnick necessary for use in the Sacred Pipe.

4.  allow Native American religious believers and practitioners use of tobacco for prayers, offerings, purification and for showing respect, which includes holding tobacco in hand during daily prayers, offering tobacco to the Sweat Lodge fire, setting or sprinkled tobacco on the ground, smoking tobacco in the Sacred Pipe, and sprinkling tobacco on the drum after prayers.

5.  allow Native American religious believers and practitioners to perform daily personal

Martinez v. Schwarzenegger, et al.
Case No. 3:08-cv-00565-BEN-CAB

prayers, which includes burning sweetgrass, sage, cedar, tobacco copal and kinnikinnick for spiritual cleansing, blessing and purification.

6. allow Native American religious believers and practitioners regular participation in making handicrafts using beads, leather and other traditional Native American materials. These materials include, but are not limited to, buffalo bones, brass beads, goat lace (sinew), beading looms (made of wood), nylon thread, small sea shells, glass seed beads (including red and blue beads), plastic crow beads, needles (not to exceed 1 ¾ inch), rabbit skin, beaver skin, cowhide, rattlesnake skin, deer skin, porcupine quills, coyote teeth (not to exceed 1 inch) and wire hooks (silver and gold not to exceed $100). Some of these items are used in the Sweat Lodge Ceremony, and some are used for the "give-away" at powwows.

7. allow Native American religious believers and practitioners to request and obtain by purchase or donation, religious items and sacred artifacts used in the Sweat Lodge ceremonies and for making totems, from the outside Native American community and from their tribes. Some of these items include headbands, wristbands, earrings, rosettes, medicine bags, sweat skirt (breach cloth), headdresses and chokers. Alternatively, Native American religious believers and practitioners may request and obtain religious items and sacred artifacts through existing CDCR policies and procedures, in which case CDCR prison and facilities' staff shall not refuse a legitimate order, unreasonably delay or confiscate religious items or sacred materials--the absence of an NASL shall not excuse these actions. If an NASL is absent, a CDCR prison or facility chaplain shall timely process receipt of Native American spiritual packages in accordance with the terms herein. Native American religious believers and practitioners shall not be denied the right to obtain and possess religious items and sacred artifacts.

8. provide the recognized Native American religious organization with access to the Native American religious fund for use by the organization and its Native American religious believers and practitioners for religious purposes. The absence of an NASL or other religious designate shall not prevent the Native American religious organization from accessing and utilizing these funds for religious purposes. The CDCR prisons and facilities shall provide funds in an amount equal to other religious organizations in the prisons and facilities.

9.  allow Native American religious believers and practitioners possession of medicine bags, which may be worn at all times, including during the Sweat Lodge Ceremony for those inmates in general population. The medicine bags shall be subject to search and inspection according to established policies and procedures. The medicine bag shall be constructed in a manner so as to be easily searched, and shall not contain any articles that cannot be easily recognized as authorized articles, and no more than a small pinch of tobacco shall be one of the articles authorized for the medicine bag.

10.  allow Native American religious believers and practitioners to make and possess tobacco ties, made of tobacco wrapped in small cloth fragments and secured by clove hitches on a string, for offerings at the Sweat Lodge Ceremony.

11.  allow Native American religious believers and practitioners possession of authorized religious items and sacred articles equal to those possessed by believers and practitioners of the other religions recognized by the CDCR for purposes of transfer between institutions and prisons under the jurisdiction of the CDCR, and prohibit confiscation of such items.

12.  prohibit defendants from desecrating or unreasonably confiscating Native American religious items and sacred artifacts during cell searches, inspection of spiritual packages, searches of the Sweat Lodge, or searches of Native American religious believers and practitioners moving to or from the Sweat Lodge Ceremony or other religious ceremony. This includes the search of personal medicine bags at any time. When practicable, the NASL will be present for searches. The defendants will require any staff that comes into contact with religious items and sacred artifacts to undergo training with regard to proper inspection of these items and to undergo training regarding the Native American religious beliefs and practices employed in the CDCR prisons and institutions. All confiscated items will be delivered promptly to the NASL.

13.  within 20 days of this order, provide plaintiff with a detailed plan under which the religious needs of the Plaintiff Class will be satisfied according to the terms of this injunction. Upon approval by plaintiff, this plan shall be incorporated within the terms of this injunction, after which the defendants shall cause each CDCR prison and facility to revise the DOM Supplement in accordance with the terms of this injunction and the particular requirements and operations of each

CDCR prison and facility no later than 6 months from plaintiff's approval of the plan. Each warden or chief administrator will be given the opportunity during this time to factor unique circumstances and specific administrative considerations for inclusion in the DOM Supplement.

14.  implement this order in accordance with the reasonable security requirements necessary for safe administration of the prisons and facilities.

15.  promulgate administrative regulations in Title 15 setting forth the terms of this injunction and directing and authorizing wardens and chief administrators at each CDCR prison and facility to develop a detailed set of policies and procedures that will supplement the DOM and establish how each CDCR prison or facility will implement this order. Included in the administrative regulations will be language to the effect that these policies and procedures may consider each prison and facilities' unique circumstances and particular requirements and operations.

**BE IT FURTHER ORDERED**, that this court will retain jurisdiction over this matter for enforcement of the terms of the injunction.

Dated: _____ , 2010

_____
ROGER T. BENITEZ, JUDGE
United States District Court

1

2

3

4

5

6

7

8

## UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

11   RALPH MARTINEZ,                                Case No. 08-CV-565 BEN (CAB)

12                                                  **APPENDIX B**

13                                      Plaintiff,  **TO THE ORDER DENYING**
                                                    **PLAINTIFF'S MOTION FOR CLASS**
             vs.                                    **CERTIFICATION**
14

15   ARNOLD SCHWARZENEGGER,
     Governor, MATTHEW CATE, Secretary of
16   the Department of Corrections and
     Rehabilitation, LARRY SMALL, Warden,
17   Calipatria State Prison, ROBERT POWELL,
     Community Partnership Manager, Calipatria
18   State Prison, T. BOREM, Correctional
     Sergeant, Calipatria State Prison, MICHAEL
19   HEIDENREICK, Catholic Chaplain,
     Calipatria State Prison, Officer H. MACIEL,
20   Correctional Officer, Calipatria State Prison,

21                                      Defendants.

22

23

24

25

26

27

28

David Dehnert, SBN 214243
Attorney at Law
838 Venezia Ave.
Venice, California 90291
Telephone: 310/822-3222
Facsimile: 310/577-5277
Email: ddehnert@ca.rr.com

Lestor J. Marston, SBN 081030
Rapport and Marston
P.O. BOX 488
405 West Perkins Street
Ukiah, CA 95482
Telephone: 707/462-6846
Facsimile: 707/462-4235
Email: marston1@pacbell.net

Attorneys for Plaintiff
Ralph Martinez

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH MARTINEZ, | CASE NO. 3:08-cv-00565-BEN-CAB |
| Plaintiff, | PLAINTIFF'S SUPPLEMENT TO ITS PROPOSED ORDER GRANTING INJUNCTION; |
| vs. | DECLARATION OF DAVID DEHNERT |
| ARNOLD SCHWARZENEGGER, et al., | IN SUPPORT THEREOF FILED SEPARATELY |
| Defendants. | |

COMES NOW the plaintiff, Ralph Martinez by and through his attorneys, and respectfully submits this supplement to the proposed Order Granting Injunction submitted to Judge Benitez for the purpose of revising the language and the scope of the proposed Order Granting Injunction. Plaintiff seeks to revise the language of the proposed injunction as follows:

    1. Add defendant Builtman's name throughout the document;

    2. Replace the first two sentences of paragraph one, pages 3-4 with the following language:

        1. provide an area within CDCR prison or facility grounds to

Plaintiff's Supplement to Proposed Order Granting Injunction        Martinez v. Schwarzenegger, et al.
Case No. 3:08-cv-00565-BEN-CAB

-1-

construct a Sweat Lodge at each institution or prison where a request
for a Sweat Lodge is made by any Native American religious believer
and practitioner for the construction and regular use of a Sweat Lodge.

3.  Add a new sentence to line 14, page 4:

The prison or institution shall make available cooking utensils and
appliances to prepare the ceremonial feast on the Sweat Lodge
grounds following the Sweat Lodge.

4.  Revise sentence in paragraph one, page 4, so that the Sweat ceremonies shall be
scheduled for at least 4 hours, excluding preparation time of 2 hours.

5.  Add the following to the end of paragraph two beginning on page 4:

The prisons and institutions shall provide reasonable
accommodations for guests attending powwows, including but not
limited to seating (benches or chairs), tables, clean towels,
disinfectant, and portable toilets for female guests.  The prisons and
institutions shall provide reasonable storage for pre-purchased food
used for the powwow.

6.  Add a new paragraph to the SHU Population Subclass provisions on page 5 with the
following:

3.  allow individual Native American religious believers and
practitioners to possess eagle and hawk feathers.

7.  Add the following to the end of paragraph three on page 6:

Sweat Lodge and prayer ceremonies.

8.  Add the following to the end of the first sentence of paragraph six on page 7:

Not under the prison or institution's regular hobby or handicrafts
program, but as a Native American spiritual activity inseparable from
Native American religious beliefs and practices.

9.  Add the following to the end of paragraph seven on page 7:

CDCR prisons and institutions are prohibited from counting a
spiritual package as a quarterly package or applying excessive
weight and cost restrictions on spiritual packages.

## Conclusion

Plaintiff respectfully requests the Court include the above revisions in the proposed order for

Plaintiff's Supplement  to Proposed Order Granting Injunction

Martinez v. Schwarzenegger, et al.
Case No. 3:08-cv-00565-BEN-CAB

1    injunction.

2    Dated: July 21, 2010                Respectfully submitted,

4                              /s/David Dehnert

5                              David Dehnert
                                ATTORNEY AT LAW

6                              Lestor J. Marston

7                              RAPPORT AND MARSTON
                              Attorneys for Plaintiff

8                              Ralph Martinez

Plaintiff's Supplement to Proposed Order Granting Injunction        Martinez v. Schwarzenegger, et al.
Case No. 3:08-cv-00565-BEN-CAB

-3-